ARTHUR LEE HINNANT, petitioner.

Suffolk. February 6, 1997. - May 13, 1997.

Present: WILKINS, C.J., LYNCH, O'CONNOR, FRIED, & MARSHALL, JJ.

*Extradition and Rendition. Constitutional Law,* Extradition. *Uniform Criminal Extradition Act. Habeas Corpus. Due Process of Law,* Competency to stand trial. *Mental Impairment. Practice, Civil,* Assistance of counsel.

Discussion of the Uniform Criminal Extradition Act, G. L. c. 276, §§ 11-20R, its procedures, and the limit on the scope of judicial review of an interstate rendition proceeding. [903-905]

This court held that, where a person arrested on a fugitive warrant is incompetent and is unable to comprehend the rendition proceedings or to assist his counsel in connection with those proceedings and where the issue is properly raised, the rendition proceedings must be stayed, on due process grounds, until the person's competence is restored. [905-910]

Where the record of a rendition proceeding raised a substantial question of doubt of an alleged fugitive's competence but there were no findings on the issue of whether the person was presently competent to understand the proceedings and to consult with his attorney, the matter was remanded for such findings. [910]

PETITION for writ of habeas corpus filed in the Superior Court Department on May 11, 1995.

The case was heard by *Thayer Fremont-Smith,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Lawrence P. Murray* (*Henry F. Owens, III* with him) for the petitioner.

*Ellyn Lazar,* Assistant Attorney General, for the Commonwealth.

MARSHALL, J. The State of North Carolina seeks rendition of the petitioner, Arthur Lee Hinnant. As a result of a severe closed head injury with coma, Hinnant suffers from residual brain damage; a medical examiner has concluded that he is functionally incompetent. We are asked to decide whether his present incompetency requires a stay of the rendition proceedings until his competency is restored.

# I

In April, 1994, Hinnant was involved in an automobile collision in Johnston County, North Carolina, in which three women were killed. As a consequence of the collision Hinnant was charged with felony manslaughter. On October 27, 1994, the North Carolina District Court for Johnston County dismissed the counts "with leave," having found that as a result of his closed head injury Hinnant lacked the mental capacity to proceed to trial.[1] Hinnant was released on personal bond to the care and custody of family members. With the knowledge of the North Carolina prosecutor,[2] immediately after his release Hinnant left North Carolina to reside in Massachusetts with his sister, Marie McCray.

On November 23, 1994, North Carolina reinstated charges against Hinnant.[3] On December 5, 1994, indictments were issued charging Hinnant with three counts of murder in the second degree. On January 11, 1995, the North Carolina Superior Court issued a warrant for his arrest, and on January 23, 1995, Hinnant was arrested in Massachusetts by Boston police as a fugitive from justice.[4]

On February 3, 1995, Hinnant appeared in the Roxbury

---

[1]Hinnant was a patient and was evaluated at Durham Veterans' Affairs Medical Center, North Carolina. Five months after the collision the examining physician concluded that Hinnant had "significant global cognitive deficits," with "little improvement in [his] cognitive abilities over the past two months." He was evaluated subsequently at Dorothea Dix Hospital in Raleigh, North Carolina. On October 24, 1996, the director of forensic psychiatry concluded that Hinnant "lacks the ability to co-operate with his attorney and conduct his defense in a rational manner" and that "Mr. Hinnant is not capable of proceeding to trial."

[2]Hinnant's North Carolina attorney and his nephew who was present at the North Carolina hearing submitted affidavits explaining the circumstances of his release.

[3]The reinstatement order states: "This case hereby is reinstated for trial pursuant to [N.C. Gen. Stat.] 15A-1009(d) on the grounds that the State believes [Hinnant] may soon become capable of proceeding." The record does not explain the basis for that statement; Hinnant left for Massachusetts immediately upon his release to his family's custody on October 27, 1994, and it appears there were no further evaluations of Hinnant between the hearing on October 27, 1994, and the reinstatement of the charges on November 23, 1994.

[4]At his initial hearing in North Carolina, Hinnant was represented by counsel. According to affidavits filed on Hinnant's behalf in the court below, when the charges were reinstated against Hinnant, North Carolina counsel was not informed. Hinnant's sister, McCray, also was not informed

Division of the District Court Department to address the outstanding warrant. Hinnant was represented by counsel at that hearing.[5] A District Court judge released Hinnant on bail and ordered that he be evaluated. See G. L. c. 276, § 20D. In April, 1995, a doctor at Veterans' Administration Medical Center in Boston concluded that Hinnant was "functionally incompetent" and unable to "comprehend the charges against him" or to "take part in his own defense."[6]

On February 15, 1995, the district attorney of Johnston County, North Carolina, filed an application for requisition of Hinnant to Johnson County for trial.[7] On March 1, 1995, the Governor of North Carolina forwarded the application to the Governor of Massachusetts, accompanied by a demand that Hinnant be delivered to the sheriff of Johnston County, pursuant to the Uniform Criminal Extradition Act.[8] Thereafter, on March 8, 1995, the Governor of Massachusetts issued a warrant for the arrest and return of Hinnant to North Carolina.

On May 10, 1995, Hinnant surrendered on the Governor's warrant, and appeared before a judge of the Superior Court

---

that her brother was wanted in North Carolina, even though the North Carolina prosecutor had been given McCray's Massachusetts address and telephone number before her brother was released to her custody.

[5]Counsel was retained by McCray to represent Hinnant. The record does not contain a transcript of the proceedings in the District Court. At a later hearing before a Superior Court judge, Hinnant's counsel said that at the District Court hearing he had informed the judge "of my client's status right now and my failure to communicate with him. He has never talked to me."

[6]The doctor concluded, in part, "In my opinion (see note of 4/28/95) [Hinnant] is functionally incompetent, because of residual brain-damage. Thus he is unable to prepare his defense or stand trial." The doctor's progress notes of April 28, 1995, state: "On the basis of his responses during our interview & my reading of his neuro & psychological testing, I believe he is unable to stand trial or even comprehend the charges against him, in other words, unable to take part in his own defense."

[7]In the application for requisition the district attorney states that "the Alleged Crime was committed in Johnston County April 23, 1994; and that [Hinnant] was personally and physically present in Johnston County, North Carolina, at the time of the commission of the alleged crime, and thereafter the subject fled from the State of North Carolina to avoid arrest and prosecution."

[8]Both North Carolina and the Commonwealth have adopted the Uniform Criminal Extradition Act. See G. L. c. 276, §§ 11-20R; N.C. Gen. Stat. §§ 15A-721 - 15A-750.

for advisement of his rights under G. L. c. 276, § 19.[9] Hinnant's counsel[10] informed the judge that he was unable to communicate with Hinnant, and explained that Hinnant had been found to be incompetent by a physician at the Veterans' Administration Medical Center. Counsel objected to the proceeding taking place on the ground that Hinnant could not understand the nature of the proceedings against him. The judge overruled counsel's objection and signed the warrant for the arrest of Hinnant.

On the same day, Hinnant's counsel filed a petition for writ of habeas corpus in the Superior Court. He sought a stay of any rendition proceeding until such time as Hinnant was deemed "competent to be able to aid counsel and comprehend the nature of the habeas corpus-extradition proceedings."[11] After a hearing, a different judge of the Superior Court denied the petition but stayed Hinnant's rendition to North Carolina pending the outcome of this appeal. Hinnant was released on bail to the custody of his sister. See G. L. c. 276, § 20D; *Upton, petitioner*, 387 Mass. 359, 370 (1982). Hinnant appealed. We transferred the appeal here on our own motion.

## II

The authority for interstate extradition is found in art. IV

---

[9]General Laws c. 276, § 19, provides in part that:

"No person arrested upon [a Governor's rendition] warrant shall be delivered over to the agent whom the executive authority of the demanding state shall have appointed to receive him unless such person shall first be taken forthwith before a justice or special justice of a court of record of this commonwealth, who shall inform such person of the demand made for his surrender and of the crime with which he is charged, and that he has the right to demand and procure legal counsel; and, if the prisoner or his counsel shall state that he desires to test the legality of his arrest, such justice or special justice shall fix a reasonable time to be allowed the prisoner within which to apply for a writ of habeas corpus. . . ."

[10]Counsel again informed the court that he had been retained by Hinnant's sister, that he was unable to communicate with Hinnant, and that Hinnant was unable to comprehend what was occurring.

[11]Hinnant's counsel informed the Superior Court judge that Hinnant "doesn't comprehend, doesn't understand, and he doesn't know who I am . . . he has never talked to me." He said that Hinnant "probably recognizes my face, he has seen me enough times now but we have never communicated. I have visited him at the Charles Street Jail before the bail was set but for all practical purposes there has been no dialogue between counsel and client."

of the United States Constitution: "A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall on demand of the executive authority of the state from which he fled, be delivered up to be removed to the state having jurisdiction of the crime." U.S. Const. art. IV, § 2, cl. 2. The extradition clause "was intended to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed." *Michigan* v. *Doran*, 439 U.S. 282, 287 (1978), citing *Biddinger* v. *Commissioner of Police*, 245 U.S. 128 (1917), and *Appleyard* v. *Massachusetts*, 203 U.S. 222 (1906).

To provide for a uniform and effective procedure for States to request and perform the interstate rendition of parties charged with crimes, in 1936 the Conference of Commissioners on Uniform State Laws approved the Uniform Criminal Extradition Act (UCEA). UCEA has been adopted by forty-eight States, including Massachusetts and North Carolina. See note 8, *supra*. In general, as adopted in Massachusetts, the statute provides that, when an individual leaves the State in which a criminal incident has occurred, and the appropriate authorities of that State (demanding State) institute criminal charges against him,[12] the demanding State may issue a demand for his rendition. G. L. c. 276, § 14. When the individual is located in another State (asylum State), a magistrate in the asylum State issues a fugitive warrant, and the individual is then arrested on that warrant. G. L. c. 276, § 20A. He may waive rendition or challenge it; either way, the demanding State must be notified of the individual's choice. G. L. c. 276, § 20J. If the individual challenges rendition, the asylum State may hold a hearing to determine whether the individual is indeed the person sought, and then either commit the individual to jail or release him on bail. G. L. c. 276, § 20D.

The agency seeking rendition in the demanding State is then required to prepare an application for the requisition for the return of the individual. G. L. c. 276, § 20L. If the Governor of the demanding State approves the application, a warrant demanding the return of the individual is issued. The warrant is sent to the Governor of the asylum State. G. L. c.

---

[12] We use the male pronoun because in this case the person challenging extradition is a man.

276, § 20K. If the Governor of the asylum State honors this demand, a Governor's rendition warrant under which an arrest may be made is issued. G. L. c. 276, § 16.

Before the individual is transported to the demanding State to face criminal charges, the statute requires that he be brought before a judge in the asylum State where he must be informed of the demand made for his surrender, the underlying charge, his right to counsel, and his right to test the legality of his arrest in a habeas corpus proceeding. G. L. c. 276, § 19. It is this stage of Hinnant's rendition proceeding that is at issue in this appeal.

There are clear limits on the scope of judicial review that may occur at this stage: "Once the governor has granted extradition, a court considering release on habeas corpus can do no more than decide (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive." *Doran, supra* at 289. In an earlier opinion we described the same issues as the relevant ones, *Maldonado, petitioner*, 364 Mass. 359, 362 (1973), and we have enforced these same limitations since *Doran*. See *Commonwealth* v. *Beauchamp*, 413 Mass. 60, 63 (1992); *Upton, petitioner*, 387 Mass. 359, 361 (1982).

As regulated by UCEA in harmony with the Federal Constitution (art. IV, § 2, cl. 2) and its executing Federal statute (18 U.S.C. § 3182 [1970]), extradition is a "summary procedure" and the courts of asylum States "may do no more" than ascertain whether the four issues open for consideration as described in *Doran* have been met. *California* v. *Superior Court*, 482 U.S. 400, 407-408 (1987). As limited as this scope of review may be, the Legislature has determined that at this stage of rendition, an arrested individual has the right to counsel so that he may participate in, and challenge, the rendition proceedings, albeit on the narrow grounds recognized in *Doran, supra*. See G. L. c. 276, § 19.

It is Hinnant's position that his claimed inability to comprehend the rendition proceedings and his lack of capacity to assist his counsel in connection with those proceedings implicate both his statutory rights as provided in G. L. c. 276, § 19, and his due process rights protected by the Fifth Amendment to the United States Constitution and art. 12 of

the Massachusetts Declaration of Rights. A determination of his competency, he says, is necessary to give effect to the procedural safeguards embodied in UCEA and to constitutionally based notions of justice. The Commonwealth argues that Hinnant's claimed incompetence does not bear in any way upon the four limited issues that the court of an asylum State may address in rendition proceedings and is irrelevant.[13]

The question is one that we have not considered before, although courts from several other States have addressed this issue squarely. Most have concluded that the competence of a petitioner to participate effectively in the rendition proceedings is relevant, and that, where he is found to be incompetent, rendition must be stayed until his competence is restored. See, e.g., *Pruett* v. *Barry*, 696 P.2d 789 (Colo. 1985); *State ex rel. Jones* v. *Warmuth*, 165 W. Va. 825 (1980), appeal dismissed, 451 U.S. 977 (1981); *Kostic* v. *Smedley*, 522 P.2d 535 (Alaska 1974); *People* v. *Kent*, 133 Misc. 2d 505 (N.Y. Sup. Ct. 1986); *Welkes* v. *Brennan*, 79 A.D.2d 644 (N.Y. 1980). But see *Kellems* v. *Buchignani*, 518 S.W.2d 788 (Ky. 1975), in which the court in a two-paragraph opinion, over the dissent of two Justices, held that "the question of the mental competence of a fugitive in extradition proceedings is not relevant." We join the majority and hold that in order for the rendition to proceed Hinnant must be determined to be sufficiently competent to comprehend the rendition proceedings and to consult with his counsel in connection with those proceedings.

First, we think it important that the Legislature requires a judge to inform the petitioner of his right to counsel and his right to contest the legality of the rendition proceeding. The Legislature could have provided that, once the Governor

---

[13]We are not persuaded by the Commonwealth's claim that Hinnant's claims amount to an affirmative defense of incompetence to stand trial in North Carolina. His written petition for habeas corpus and his counsel's arguments to three different Massachusetts judges all focus on his inability to comprehend the nature of the extradition proceedings and his inability to communicate with counsel in connection with those proceedings. There are sound reasons why it is inappropriate for a Massachusetts court to determine whether Hinnant is or is not capable of defending the crimes with which he is charged in North Carolina. *Commonwealth* v. *Beauchamp*, 413 Mass. 60, 64 (1992). See *Charlton* v. *Kelly*, 229 U.S. 447, 462 (1913). That is not Hinnant's claim here.

issues a rendition warrant under which an arrest may be made, the defendant must be returned, summarily, to the demanding State. It did not do so. Having determined that a judicial hearing is required, the statutory right to counsel is meaningless if the petitioner is so incompetent that he is unable to comprehend what is occurring and to assist counsel, as appears to be the case here. The petitioner must at the very least understand the nature of rendition proceedings so that he can decide whether to waive rendition or challenge it on the narrow grounds available to him. Were we to ignore the relevance of his mental capacity, Hinnant's right to counsel "would be a farce" and the "statutory right to have the assistance of counsel would, in such a case, become a nullity." *Kostic* v. *Smedley, supra* at 537. See *Welkes* v. *Brennan, supra* at 818 (representation would be rendered "a meaningless formality because of an inability to understand the nature of the extradition proceeding or to assist [counsel] in either waiving or challenging extradition on the narrow grounds available in this summary proceeding").

Nor are we inclined to interpret Hinnant's statutory right to counsel in a manner which could deprive him of his rights to due process of law under the Federal and Massachusetts Constitutions. We recognize preliminarily that habeas corpus is a civil as opposed to criminal proceeding. *Upton, petitioner*, 387 Mass. 359, 365 (1982). Nevertheless, where a potential deprivation of liberty is involved,[14] it is appropriate that we

[14]In *Consalvi, petitioner*, 376 Mass. 699, 701 (1978), we said that "the restraint of liberty incident to interstate rendition is no less substantial than the detention occasioned by the execution of [an arrest warrant]," and we cited with approval *Ierardi* v. *Gunter*, 528 F.2d 929, 930 (1st Cir. 1976): "At best, [rendition] means an extended period of detention involving custody pending administrative arrangements in two states as well as forced travel in between. At worst it means separation from a familiar jurisdiction and effective denial of the support of family, friends and familiar advisers." In his concurring opinion in *Doran*, Justice Blackmun noted that "[t]he extradition process involves an 'extended restraint of liberty following arrest' even more severe than that accompanying detention within a single State. Extradition involves, at a minimum, administrative processing in both the asylum State and the demanding State, and forced transportation in between. It surely is a 'significant restraint on liberty.'" *Michigan* v. *Doran*, 439 U.S. 282, 296 (1978), quoting *Gerstein* v. *Pugh*, 420 U.S. 103, 114 (1975) (Blackmun, J., concurring).

consider due process rights as we would were this a criminal proceeding.[15]

Due process — under both the Fourteenth Amendment of the United States Constitution and art. 12[16] — requires that the accused be competent to stand trial and to consult effectively with his counsel. See *Drope* v. *Missouri*, 420 U.S. 162 (1975); *Pate* v. *Robinson*, 383 U.S. 375 (1966); *Commonwealth* v. *Kostka*, 370 Mass. 516, 522 (1976); *Commonwealth* v. *Vailes*, 360 Mass. 522, 524 (1971). He must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him." *Dusky* v. *United States*, 362 U.S. 402, 402 (1960) (per curiam). See *Riggins* v. *Nevada*, 504 U.S. 127, 139 (1992) (Kennedy, J., concurring). We have applied this same test in the Commonwealth. As we observed in *Commonwealth* v. *Hill*, 375 Mass. 50, 51-52 (1978), citing *Vailes, supra* at 524: "It has long been the law of this Commonwealth that the 'trial, conviction or sentencing of a person charged with a criminal offence while he is legally incompetent violates his constitutional rights of due process' (footnote omitted), whether under the Fourteenth Amendment to the Constitution of the United States or under art. 12 of the Declaration of Rights to the Constitution of this Commonwealth."

The Commonwealth relies on *Romeo* v. *Roache*, 820 F.2d 540 (1st Cir. 1987), to urge a contrary result. However, the court in *Romeo* noted that "we are not presented here with a claim that petitioner is catatonic, has lost all contact with reality, or is totally unable to communicate, and we do not decide how we would view a due process argument were a severe claim of that sort presented." *Id.* at 544. Hinnant is not able to communicate with his lawyer and is unable to comprehend the charges against him; he presents just such a

---

[15]The Alaska, Colorado, Florida, West Virginia and New York courts also have concluded that habeas corpus proceedings to test the legality of extradition will be considered criminal in nature. See *Kostic* v. *Smedley*, 522 P.2d 535 (Alaska 1974); *Mora* v. *District Court for Jefferson County*, 177 Colo. 381 (1972); *State ex rel. Jones* v. *Warmuth*, 165 W. Va. 825 (1980); *People* v. *Kent*, 133 Misc. 2d 505 (N.Y. Sup. Ct. 1986); *Bentzel* v. *State*, 585 So. 2d 1118 (Fla. Dist. Ct. App. 1991).

[16]The Massachusetts Legislature has also determined that "[n]o person shall be deprived of his liberty or held . . . in any place against his will . . . except by due process of law . . . ." G. L. c. 248, § 35.

claim.[17] Our decision today is consistent with the purpose of the extradition clause; Hinnant will not be seeking "sanctuary" as a fugitive from justice of another State. *Michigan* v. *Doran*, 439 U.S. 282 287 (1978). Rather, his present competence is relevant to determine whether any of the permissible factors of inquiry have been satisfied. See *State ex rel. Jones* v. *Warmuth*, 165 W. Va. 825, 830 (1980). As the Colorado Supreme Court noted when considering the same question: "It is not hard to imagine situations . . . in which a petitioner's rational and factual understanding of the proceedings or his ability to assist counsel with a reasonable degree of rational understanding would be important in resolving . . . material issues. Key factual questions concerning the identity of the petitioner as the accused and the presence of the petitioner in the demanding state at the time the crime was committed are not always easily resolved." *Pruett* v. *Barry*, 696 P.2d 789, 793 (Colo. 1985).

While the Commonwealth argues vigorously that in this case Hinnant's competency is irrelevant because he has "stipulated" to his identity,[18] and, it says, there is no question that he was in North Carolina at the time of the accident, we are no more prepared to conclude that the State can impair the liberty interests of a person wanted on extradition who does not understand what is occurring, does not understand the charges against him and cannot communicate with counsel than we would be were this a criminal proceeding. See *Pate* v. *Robinson*, *supra* at 384 ("it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial"); *Commonwealth* v. *Hill*, *supra* at 53.

This does not mean that in a habeas corpus proceeding in connection with extradition, a mere suggestion of incompetence unsupported by any facts will require a motion judge to

---

[17]In *Romeo* v. *Roache*, 820 F.2d 540 (1st Cir. 1987), the court noted that the individual challenging extradition "had a history of past drug abuse and exhibited paranoid ideas, . . . was oriented to time, person, and place and his recent and remote memory were intact." *Romeo*, *supra* at 544. As a result of Hinnant's severe closed head injury, the medical reports evidence that his memory is severely impaired. The examining physician in North Carolina concluded that the "seriousness of his closed-head injury is compatible with the claim of memory loss."

[18]The record does not reflect any such stipulation, although there appears to be no dispute concerning that issue.

stay extradition and await a competency examination. Here, the issue was properly raised by Hinnant; the North Carolina court had determined that there was a serious issue with respect to his competency, and an evaluation of Hinnant in Massachusetts indicates that he may not be competent to comprehend even the narrow issues that arise in an rendition proceeding. See *Kostic* v. *Smedley*, 522 P.2d 535, 537 (Alaska 1974) (petitioner had been examined by psychiatrist in connection with separate criminal action then pending in Alaska and judge ordered examination because of petitioner's previous history of psychiatric illness). The facts shown on this record are sufficient to raise a substantial question of doubt of Hinnant's competence.

The judge made no findings with respect to Hinnant's present competency. The two medical examinations of Hinnant in North Carolina clearly were conducted in connection with his competency to face criminal charges in North Carolina. That issue is not before us; an extradition habeas proceeding is "not the appropriate time or place for entertaining defenses or determining the guilt or innocence of the charged party." *California* v. *Superior Court*, 482 U.S. 400, 407 (1987). While the medical examination in Massachusetts was conducted in connection with the rendition proceedings, it is not entirely clear from the record whether the evaluation of Hinnant's competency was directed to these proceedings, or more broadly to his competency to face the underlying criminal charges. Accordingly, we vacate the Superior Court's ruling, and remand this case for a determination whether Hinnant is presently competent to understand the nature of the rendition proceedings and to consult with his lawyer with a reasonable degree of rational understanding. *Dusky* v. *United States*, *supra* at 402. In the event that he is found not competent, the extradition will be stayed until such time as his competency is restored.

*So ordered.*